# EXHIBIT 2

## MANUFACTURING AGREEMENT

**THIS MANUFACTURING AGREEMENT** (the "**Agreement**") is made as of May 3, 2019 (the "**Effective Date**") by and between **BERRY GOOD LABS LLC (d/b/a Texas Beauty Labs)**, a Texas limited liability company with a manufacturing facility located at 100 Michael Angelo Way, Suite 900, Austin, Texas 78728-1257 (the "**Manufacturer**"), and **SERFACE CARE, INC. (d/b/a Myro)**, a Delaware corporation with its corporate office located at 132 Mulberry Street, Suite 503, New York, New York 10013 (the "**Company**").

## RECITALS

**WHEREAS**, the Company is engaged in the business of manufacturing, marketing, distributing, promoting, advertising and selling Deodorant, including without limitation the Products, using the Trademarks and the Specifications;

**WHEREAS**, the Manufacturer is engaged in the business of manufacturing cosmetics products for third parties in accordance with specifications provided by such third parties; and

**WHEREAS**, the Company and the Manufacturer desire to enter into this Manufacturing Agreement setting forth the mutual rights, obligations and responsibilities of the respective parties with regard to the manufacture by the Manufacturer of Products for Company.

## PROVISIONS

**NOW, THEREFORE**, in consideration of premises and mutual covenants in this Agreement, and for other consideration, the adequacy of which is hereby acknowledged, the parties hereto agree as follows:

**1.     Definitions.**  As used herein, the following terms shall have the meanings set forth respectively below:

   **1.1**     "**Business Day**" means any day other than (i) a Saturday, (ii) a Sunday, (iii) a United States Federal holiday or (iv) a New York State or Texas state holiday.

   **1.2**     "**Deodorant**" means stick deodorant personal care products.

   **1.3**     "**Formula(s)**" means one or more Deodorant formulas developed by the Manufacturer for the Company for use in connection with the Products, whether or not used for Products sold by the Company to its customers.

   **1.4**     "**Key Components**" means the key ingredients and/or any by-product, equivalent or substitute thereof, such as are required in the Specifications for use in manufacturing Products.

   **1.5**     "**Products**" means the variations in base fragrances packaged in various sizes of Deodorant that are based on the Formula(s) and listed in **Exhibit A** as in effect from time to time, which may use the Trademarks, and any new additions that are mutually agreed upon in accordance with **Section 3.3**, including without limitation products in R&D phase. The term "Products" as used herein shall mean only those products set forth on **Exhibit A**, as in effect from time to time.

   **1.6**     "**Quality Control Notice Delivery Date**" means, with respect to any Products actually received by the Company, the date that occurs three (3) days following the date of receipt thereof.

# EXHIBIT 2

1.7  "**Specifications**" means the direction sheets, including a bill of materials and similar information, for the manufacture of the Products provided to the Manufacturer by the Company, as set forth on **Exhibit B** as in effect from time to time.

1.8  "**Trademarks**" means the trademarks, trade names and logos, as provided by Company, used in connection with the Products, as specified on **Exhibit D** as in effect from time to time, together with any and all designs, trade dress, copyrights, goodwill or other intellectual property associated therewith.

2.  **Manufacturing Requirements.**

    2.1  **Requirements.** On the terms and subject to the conditions set forth in this Agreement, the Company grants to the Manufacturer, and the Manufacturer hereby accepts, the right and obligation, commencing on the Effective Date and thereafter continuing for the remainder of the Initial Term and any Additional Terms, to manufacture the Products in accordance with the terms of this Agreement.

    2.2  **Obligation.** The Manufacturer shall make available from time to time the necessary production equipment and line capacity to produce and supply the Products to Company in strict compliance with the Specifications and this Agreement. The Manufacturer shall immediately notify Company of any fact, event or circumstance that causes, or could be reasonably expected to cause, the Manufacturer to be unable to meet the requirements for Products reflected in any Company forecasts and any orders placed by Company.

    2.3  **Reservation of Rights.** No right other than that expressly contained herein is hereby granted to the Manufacturer, and the Manufacturer expressly disclaims any right to produce anything whatsoever for the Company other than Products in accordance with this Agreement.

    2.4  **Limitation.** The Manufacturer shall manufacture the Products solely for the account and benefit of Company. The Manufacturer is expressly prohibited from manufacturing any of the Products or using any Formula(s), any Trademarks, Specifications or other intellectual property or confidential or proprietary information of the Company, in each case, for the Manufacturer's own account or benefit or the account or benefit of any third party. Subject to the foregoing, and without limitation of the Manufacturer's obligations under this Agreement, the Company expressly acknowledges that the Manufacturer is in the business of developing formulas and manufacturing deodorant products for other third parties and that Manufacturer will continue to do so during the term of this Agreement.

    2.5  **Plant Location**. Manufacturer shall manufacture the Products solely at Manufacturer's plant, currently located at 100 Michael Angelo Way, Suite 900, Austin, Texas 78728-1257 (the "**Plant**"). The Manufacturer intends to move the Plant to another location in the near future and it will give written notice to the Company of the new Plant location promptly following a decision to move the Plant.

    2.6  **Compliance.** In addition to its other obligations hereunder, the Manufacturer shall manufacture the Products strictly in accordance with the Specifications, the Formulas and this Agreement.

    2.7  **Packaging.** The Manufacturer shall package the Products using only containers and labels provided by the Company. The Manufacturer shall in no event package any products other than the Products using any containers or labels bearing the Trademarks.

    2.8  **Test Runs.** From time to time, the Company may request that the Manufacturer perform test runs, which the Manufacturer will complete within 30 days after receipt of a written request providing reasonably detailed instructions for running such test run. The Manufacturer will provide a reasonable number of personnel to perform the test run in accordance with the instructions. All components, materials,

EXHIBIT 2

ingredients, raw products, packaging materials, labels and other items or products required for any test run (collectively, "**Test Run Materials**") will be provided by the Manufacturer. The Company shall reimburse the Manufacturer for any Test Run Materials bought by the Manufacturer in accordance with the Company's express written instructions and used in the test run(s). The Manufacturer shall provide a quote to Company for each test run that the Company may request within a timely manner. The Company will pay the Manufacturer for each test run a reasonable fee to be agreed by the Company and the Manufacturer.

    **2.9**    **Exclusivity.**

    **2.9.1**    During the six-month period commencing on the Effective Date and ending on the six-month anniversary of the Effective Date (the "**Exclusive Period**"), the Manufacturer shall not directly or indirectly engage in the production of any refillable deodorants (such production, the "**Prohibited Production**") for anyone other than the Company pursuant to this Agreement.

    **2.9.2**    If the Company orders less than 600,000 Product units during the Exclusive Period, then upon expiration of the Exclusive Period, subject to the Manufacturer's obligations under this Agreement, the Manufacturer shall be free to engage in the Prohibited Production.

    **2.9.3**    If the Company orders 600,000 or more Product units during the Exclusive Period, then the Exclusive Period shall be extended for an additional six-month period ending on the day prior to the anniversary of the Effective Date (the "**Extended Exclusive Period**"), and the Manufacturer shall not engage in the Prohibited Production for anyone other than the Company pursuant to this Agreement during the Extended Exclusive Period.

    **2.9.4**    If the Company orders less than 600,000 Product units during the Extended Exclusive Period, then upon expiration of the Extended Exclusive Period, subject to the Manufacturer's obligations under this Agreement, the Manufacturer shall be free to engage in the Prohibited Production.

    **2.9.5**    If the Company orders 600,000 or more Product units during the Extended Exclusive Period or any Further Exclusive Period, then the Extended Exclusive Period shall be extended for an additional six-month period (each such six-month period, a "**Further Exclusive Period**") commencing immediately following the last day of the Extended Exclusive Period (or prior Further Exclusive Period), and the Manufacturer shall not engage in the Prohibited Production for anyone other than the Company pursuant to this Agreement during that Further Exclusive Period.

    **2.9.6**    For each Further Exclusive Period, the following shall apply: (i) if the Company orders less than 600,000 Product units during such Further Exclusive Period, then the exclusivity contemplated by this **Section 2.9** shall terminate immediately following the last day of such Further Exclusive Period and be of no further force or effect; provided, however, (ii) if the Company orders 600,000 or more Product units during such Further Exclusive Period, then the exclusivity contemplated by this **Section 2.9** shall be extended for an additional Further Exclusive Period, and the Manufacturer shall not engage in the Prohibited Production for anyone other than the Company pursuant to this Agreement during that additional Further Exclusive Period; provided further that, for clarity, it is acknowledged and agreed that once the exclusivity contemplated by this **Section 2.9** terminates due to lack of orders during a given Further Exclusive Period, the exclusivity contemplated by this **Section 2.9** shall have no further force or effect immediately following the last day of such Further Exclusive Period, and exclusivity cannot be revived.

    **2.10**  **Minimums.**

    **2.10.1**  Subject to the Manufacturer's compliance with its obligations to the Company and to the continuing effectiveness of this Agreement, the Company shall use the Manufacturer to manufacture

**EXHIBIT 2**

not less than 95% of the Products (including any Deodorant products that are based on the Formula(s), even if not listed on Exhibit A) produced for the Company, measured by volume, from the Effective Date through and including December 31, 2020; provided that (i) in addition to its obligations under **Section 2.2**, the Manufacturer shall immediately notify the Company if at any time the Manufacturer reasonably believes that it is unable to fulfill the Company's expected volume of production at any time, and (ii) if both (x) the Company's expected volume of production for calendar year 2020 exceeds 2,500,000 units of Product, and (y) either (a) the Manufacturer notifies the Company, or (b) the Company reasonably believes, upon inquiry, in each case described in clause (a) or (b), that the Manufacturer is not able to meet the requirements for Product orders placed by Company in a timely manner, the Company shall not have any obligations to the Manufacturer pursuant to the foregoing provisions of this **Section 2.10.1**, and the Company and the Manufacturer will discuss a revised minimum production percentage.

2.10.2   Nothing in this Agreement shall require Company to use any services of the Manufacturer with respect to anything whatsoever other than the amounts of Products specified in **Section 2.10.1**. Subject to **Section 2.10.1**, the Company expressly reserves its unlimited right to produce any products whatsoever, and order any products whatsoever from anyone, expressly including, without limitation, Deodorant products that are Products under this Agreement.

**3.   Pricing.**

3.1   **General.**  Subject to this Agreement, the Manufacturer shall produce the Products and sell the same to the Company, and the Company shall purchase such Products from the Manufacturer, for the price for each Product as set forth in **Exhibit A** as in effect from time to time (each such price, the "**Price**" and collectively, the "**Prices**"). Prices are Ex Works the Plant.

3.2   **Suppliers of Production Inputs.**  The Company may provide a list of preferred vendors for all Key Components and other production inputs and may negotiate prices and terms. Subject to **Section 3.4** and **Section 4.1**, the Manufacturer will purchase against those terms, or can provide for Company's approval alternative supply options where available. All suppliers of Key Components and other production inputs must be approved by the Company before being on-boarded.

3.3   **New Product Price.**  In the event the Company proposes to add to **Exhibit A** as a Product hereunder any new variety of Deodorant, and such Product shall not previously have been developed, the Company shall submit Specifications, together with annual and 90-day forecasts, for such proposed new Product to the Manufacturer, and based thereon, the Manufacturer shall quote to the Company a Price for such proposed new Product, provided that the parties shall mutually determine whether a test run is needed before such proposed new Product can be priced or manufactured by the Manufacturer. The Manufacturer's quoted Price shall be the initial applicable Price initially added to **Exhibit A**. The Company shall then determine in its discretion, and so notify the Manufacturer, whether it elects to add such new Product to **Exhibit A**. In the event Company so elects, the proposed new variety of Deodorant shall immediately thereafter and for the remainder of the Initial Term and any Additional Terms constitute a Product for all purposes of this Agreement. Any change of Specifications for an existing Product that constitutes a new formulation and not a new vendor for an existing item of ingredients or packaging (which shall be treated in accordance with **Sections 3.1** and/or **3.2** above), which shall not previously have been developed, shall be treated in the same manner as set forth in this **Section 3.3**, as if it were a proposed new Product.

3.4   **Price Changes.**

3.4.1   The Manufacturer may decrease, or request increases, of Prices based on cost changes, including but not limited to decreases or increases in raw materials, packaging, energy, labor, margin requirements. The Manufacturer will provide the Company at least thirty (30) days prior written notice of any proposed Price increases. The Manufacturer and the Company will

4

review Prices not less frequently than on an annual basis. The Company shall not unreasonably withhold approval of any Price increase reasonably proposed by the Manufacturer; provided that the Manufacturer shall have provided to the Company information reasonably requested by the Company in connection with such Price increase.

**3.4.2**  The Manufacturer will review prices paid for raw materials used to manufacture Products every six months during the Initial Term and any Additional Term. If the prices actually paid by the Manufacturer for raw materials used to manufacture Products changes by ten percent (10%) or more as compared to the immediately preceding six-month period, then the Manufacturer will notify the Company and the Manufacturer and the Company will meet and discuss Prices.

**3.4.3**  Within five (5) days following the last day of each calendar month, the Manufacturer shall give written notice to the Company, setting forth the amounts of plastic packaging provided by the Company for the Products that were subject to scrap and/or loss during such month (the "**Scrap/Loss Materials**"). If the Scrap/Loss Materials for that month exceed five percent (5%) of the total amount of plastic packaging provided by the Company for the Products for that month, then the Manufacturer and the Company agree to meet and discuss a scrap credit related to that month.

**3.4.4**  Notwithstanding anything in the contrary in this Agreement, the Company shall have no obligation whatsoever to pay any price for any Product in excess of the Price set forth on **Exhibit A** as then in effect.

**4.**   **Special Ingredients, Raw Material Purchases and Product Discontinuations.**

**4.1**   **Special Ingredients.** The Company will be responsible for providing all packaging and labels for the Products and the Manufacturer will not be responsible for procuring packaging and labels for the Products. The Manufacturer understands that the Products may contain Key Components, raw materials and other ingredients produced and/or provided directly from the Company, or from specific suppliers traditionally utilized by the Company (all of the foregoing, collectively, "**Special Ingredients**"). The Manufacturer shall be responsible for procurement of all of such Special Ingredients exclusively from the Company or the Company's designated and/or approved source ("**Approved Source**") at a time the Manufacturer deems necessary to ensure such Special Ingredients arrive on time and do not adversely impact production commitments. The Manufacturer shall in no event substitute any other ingredient or packaging material for any Special Ingredient in the manufacture of the Products without the prior written approval of the Company.

**4.2**   **Manufacturer Sourcing of Ingredients and Packaging**. The Company understands that to allow for the efficient functioning of the Manufacturer's supply chain, there will be a desire and a need for both the Company and the Manufacturer to cooperate in the identification of alternative sources of certain unique ingredients used in the Products such that adequate quantities, order lead times and ingredient performance will allow for the timely manufacture of quality Products. In addition to any existing supplier relationships procured by the Manufacturer or the Company, the Manufacturer is entitled to seek additional supply relationships; however no such relationships are to be formally established (by execution of a written agreement or otherwise) in connection with the manufacture of the Products for the Company, and no products or services whatsoever may be purchased by or on behalf of the Manufacturer in connection with the manufacture of the Products for the Company from any person or entity, without the written consent of the Company. Such written consent must be sought by Manufacturer no later than 15 days prior to the end of the quarter preceding the proposed start date of an agreement with a new supplier. For example, for the calendar quarter starting on July 1 and ending on September 30, the Manufacturer must seek approval by Company of new suppliers by June 15th. Notwithstanding the foregoing, (i) the Manufacturer shall in no

event substitute any other ingredient or packaging material for any ingredient or packaging component in the manufacture of the Products without the prior written approval of the Company first obtained in advance in each instance and (ii) the Price with respect to Products for which the Company shall have submitted a Purchase Order prior to the execution and delivery of an agreement with a new supplier, pursuant to which agreement Key Components or other raw materials are supplied, shall not be increased notwithstanding such agreement.

In addition, both the Manufacturer and the Company agree that when the Manufacturer sources a mutually-agreed upon alternative to an ingredient, package or other materials as may be identified in the Specifications, and when such alternative item is at a lower cost than the legacy item, the applicable Price shall be reduced in accordance with such cost reduction.

4.3     **Certificate of Analysis for Special Ingredients**.  As a part of the Manufacturer's comprehensive product safety and quality practices, the Manufacturer shall be responsible to obtain from the Company or Company's Approved Source a Certificate of Analysis ("**COA**"), to accompany each order for all Special Ingredients required in the manufacture of the Products. The Company will be responsible for notifying its Approved Sources that the delivery of COAs is expected to be part of the normal course of business of all Approved Sources, and Manufacturer will be responsible for procurement of such COAs on a regular basis. Should an Approved Source repeatedly or habitually neglect to provide such COAs, Manufacturer must notify the Company immediately, and the Company may in its discretion address the issue with the Approved Source.

4.4     **International Distribution.**     The Manufacturer acknowledges that the Company may, in its discretion, distribute Products outside the United States ("**Non-U.S. Distributions**"). The Manufacturer shall provide to the Company, and assist the Company in obtaining, all documents reasonably requested by the Company in connection with Non-U.S. Distributions, including, without limitation, lab results and government licenses.

4.5     **Product Discontinuation**.  In the event a Product is discontinued, or otherwise deemed obsolete by the Company, the Manufacturer shall notify the Company of all remaining in-house inventory of the Product and related raw materials, including without limitation ingredients and packaging. The Company agrees to either (i) pay Manufacturer within 30 days the value of all associated raw materials unique to the discontinued Product and also for finished Products which the Manufacturer has on hand; or (ii) reinstate the Product. The Manufacturer agrees to take all reasonable steps not to incur any costs related to the discontinued Product.

4.6     **Manufacturer Pricing Efforts**. Notwithstanding anything to the contrary in this Agreement, the Manufacturer shall at all times use commercially reasonable efforts to obtain the lowest price acceptable to the Company for all Key Components and other Special Ingredients, other production inputs and other items required for the Manufacturer's performance of its services hereunder.

**5.     Forecasts, Inventory and Shipment.**

5.1     **Forecasts.** The Company shall provide the Manufacturer with a general estimate of the 12-month demand, broken down by month, at the signing of this Agreement and on first Business Day of each calendar month as reasonably necessary such that Manufacturer can adequately plan to meet such demand. In addition, the Company shall provide, on or by the first Business Day of each month, a forecast detailing its anticipated requirements for each Product needing to be produced during the immediately-following 90-day period (each, a "**90-Day Forecast**").  The Manufacturer and the Company agree that these forecasts are estimates only and should not be relied on as representations of guaranteed production. Notwithstanding the foregoing, the Manufacturer shall at all times maintain a supply of Key Components and other raw materials in amounts as strictly necessary to ensure that the Manufacturer shall at all times produce all

# EXHIBIT 2

Products contemplated by each 90-Day Forecast in a timely manner and in accordance with this Agreement and such 90-Day Forecast.

**5.2   Purchase Orders.** The Company shall submit a written purchase order for Products (each, a "**Purchase Order**") by email to orders@texasbeautylabs.com. Each Purchase Order shall set forth the number and type of Products ordered and the date which the Company requires the Products to be available for shipping. The Company shall provide each Purchase Order to the Manufacturer not less than 30 calendar days prior to the date on which the Company requires the Products to be fully produced, packaged, and ready to be shipped, unless otherwise agreed upon by the parties.

**5.3   Rush Orders.** The Manufacturer understands that due to the nature of the Company and its growth there may be times when the Company will need Products in an immediate fashion and the ordering process established in **Section 5.2** will not be adequate ("**Rush Production Orders**"). The Manufacturer agrees to use its commercially reasonable efforts to facilitate these Rush Production Orders.

**5.4   Inventory.** In addition to its obligations in **Section 5.1**, the Manufacturer shall order, maintain, handle and store inventories of raw material ingredients and packaging at levels adequate to meet Company's forecasted requirements for the Products. Such inventory management shall be in full compliance with all GMPs and standards required to meet the definition of Deodorant contained in **Section 1.3**. Notwithstanding anything to the contrary in this Agreement, the Manufacturer shall at all times maintain at the Plant, or shall obtain within 48 hours upon request by the Company, adequate supplies, as determined by the Company, of Key Components, Special Ingredients, other raw material ingredients and packaging as shall be necessary to produce the Products in accordance with the Specifications and this Agreement, and otherwise comply with all of its obligations in this Agreement.

**5.5   Shipment.** All shipments will be Ex Works the Plant. The Manufacturer shall reasonably cooperate with the Company in making Products available for shipment and arranging for shipping of finished Products. All Purchase Orders will specify a shipment date (each, a "**Shipment Date**"), at which time all Products shall have been completed and shall be available for shipment, in each case, in accordance with this Agreement (such Products, "**Completed/Ready Products**"). Unless expressly agreed in writing by the Company, the Shipment Date shall not be later than the date eight weeks (or, with respect to order notices delivered by the Company between October 1 and December 31 of each year, 12 weeks) after the Company shall have delivered the applicable Purchase Order to the Manufacturer. Should the Company choose to do so, it may require the Manufacturer to hold Completed/Ready Products in storage for a fee of $5.00 per pallet position per day beyond the specified Shipment Date. Should the Company instruct the Manufacturer not to have Completed/Ready Products available for shipment in accordance with the stated Shipment Date, then the Company will be deemed to have asked for storage from Manufacturer and will be billed accordingly, and the Company must remove any stored Completed/Ready Products within five (5) Business Days from the receipt of written demand by the Manufacturer unless other arrangements have been made previously. Subject to the immediately-preceding sentence, and except in the case of a Force Majeure (as defined in **Section 21**), if any Products are not Completed/Ready Products within seven (7) days following the applicable Shipment Date (the "**Deadline**"), then for each Business Day following the Deadline, if such Products are not Completed/Ready Products on such Business Day, the Company may offset against any amounts due to the Manufacturer at any time an amount equal to 1% of the aggregate amount payable for such Products, as set forth on the applicable Invoice or otherwise. For illustrative purposes only, if the certain Products are not Completed/Ready Products until five (5) Business Days after the Deadline, then the Company may offset an amount equal to 5% of the aggregate amount due for such Products.

**6.   Payment Terms.**

   **6.1   General.**

**EXHIBIT 2**

      **6.1.1**    Within 48 hours after the Company delivers each Purchase Order to the Manufacturer, the Manufacturer shall deliver an invoice therefor to the Company by email to finance@mymyro.com or such other email address as the Company may specify from time to time pursuant to **Section 15**.

      **6.1.2**    With respect to the Invoice delivered for the initial Purchase Order delivered by the Company (the "**Initial Invoice**"), (x) 50% of the aggregate amount set forth on such Invoice shall be due and payable within five days after the Company's receipt of such Invoice and (y) the remainder shall be due and payable within five days following receipt by the Company of all finished Products ordered pursuant to such Purchase Order.

      **6.1.3**    With respect to each Invoice delivered after delivery of the Initial Invoice, the amount set forth thereon shall be due and payable, with respect to Products for which a Quality Control Notice (as defined in **Section 8.3.2**) shall have been delivered, 30 days after the occurrence of both (i) the Company's receipt of the Products set forth on such Invoice and (ii) the Quality Control Notice Delivery Date.

    **6.2**    **Late Payment.** Should the Company fail to make payment by the due date therefor pursuant to **Section 6.1**, the Manufacturer reserves the right to suspend production of Products until payment of the invoice(s) that is in arrears.

**7.**    **Trademarks; Formula.**

    **7.1**    **Acknowledgment.**  The Manufacturer acknowledges that except as set forth in this Agreement, no right or license (or sublicense) of any kind or nature, express or implied, is hereby granted to the Manufacturer in or to the Trademarks or any intellectual property associated with the Products (including without limitation the Specifications), and that all rights in and to the Trademarks, the Specifications and the goodwill pertaining thereto, and any and all other intellectual property provided by, or otherwise claimed by, the Company, belong exclusively to the Company.

    **7.2**    **Covenant.**  The Manufacturer agrees that it shall not, during the term of this Agreement or thereafter, make any unauthorized use of any Trademark or the Specifications or adopt or use as its own a trademark the same or confusingly similar to any Trademark or perform any material act or omission adverse to the Company's rights in the Trademarks and the Specifications.

    **7.3**    **Formula.**

      **7.3.1**    The Manufacturer hereby grants to the Company an irrevocable (during the Initial Term and each Additional Term), exclusive, worldwide, transferable, sublicenseable and royalty-free right and license to use each Formula, solely in connection the manufacturing, selling and distribution of Products (the "**License**"). Unless until ownership of the Formulas is transferred to the Company pursuant to **Section 7.3.3**, (i) the Formulas are licensed and not sold and (ii) the Manufacturer hereby reserves all rights in and to the Formulas that are not specifically granted in this Agreement.

      **7.3.2**    Further, if the Company delivers Purchase Orders to the Manufacturer with respect to 1,000,000 units of Product, then (i) the Manufacturer shall promptly provide to the Company a detailed copy of the Formula and all other Formula information (in each case, with respect to all past, present and future iterations of the Formula) (such copy and other information, collectively, "**Formula Information**") and (ii) ownership of the Formula shall remain with the Manufacturer and shall continue to be licensed by the Manufacturer to the Company in accordance with **Section 7.3.1**, except that the Company also shall have (x) the right to use the Formula Information to make or have made Deodorant products other than the Products and (y) the other rights set forth in this **Section 7.3.2**.

# EXHIBIT 2

    **7.3.3** In addition, if the Company delivers Purchase Orders to the Manufacturer with respect to 2,500,000 units of Product, then in addition to its other obligations hereunder, the Manufacturer shall assign, and hereby assigns, all rights in, to and under the Formula and all other Formula Information (such rights and other Formula Information, collectively, the "**Owned Formula**") shall be, and hereby are, hereby assigned to the Company, without the further act of any Person.

  **7.4** **Prohibited Ingredients.** The Manufacturer represents and warrants to the Company that the Formula shall not at any time contain any items set forth on **Exhibit C**.

**8.** **Quality Control.**

  **8.1** **Quality Standards.** So that the identity of the Trademarks may be preserved and consumers assured of the Products' uniformity, subject to **Section 7.4**, the Manufacturer agrees to manufacture, package and handle all Products in strict conformity with the Formula, the Company's Specifications and other quality control and product safety standards, policies and procedures established and promulgated by Company from time to time in its discretion.

  **8.2** **Compliance with Regulations.** The Manufacturer agrees that the Products will be manufactured in compliance with, and will not be adulterated or misbranded within the meaning of, the Federal Food, Drug and Cosmetic Act of 1938, or any other federal, state, foreign or local laws or regulations applicable thereto, will not constitute an article that may not be introduced into interstate commerce and will be manufactured in compliance with all applicable federal, state, foreign or local laws and regulations applicable thereto. Unless Company otherwise agrees in writing, the Manufacturer will destroy all inventories that are not in conformity with Food and Drug Administration rules and regulations or any applicable federal, state, foreign and local laws. Manufacturer agrees to notify the Company promptly of any regulatory action of which the Manufacturer has knowledge that is taken in relation to it by any federal, state, foreign, county or municipal authority and that relates to or affects the manufacture, storage, distribution or sale of the Products.

    **8.3** **Quality Assurance.**

    **8.3.1** **Manufacturer Obligations.** All Products delivered to the Company are assured by the Manufacturer of quality pursuant to **Section 8.2** above. At the time of delivery, Manufacturer must furnish the Company with lab results confirming that Product being shipped conforms to Company's safety standards. Any non-conforming Product will be rejected by Manufacturer not later than immediately prior to the time of shipment. Lab testing will be coordinated by Manufacturer but paid for by the Company directly to the lab. The Company and the Manufacturer will work together to source a mutually agreed upon lab for quality assurance testing (an "**Agreed Lab**"); <u>provided</u> that if the Company and the Manufacturer shall not have sourced an Agreed Lab within 14 days following the giving of the Company's first request to the Manufacturer for discussions regarding prospective Agreed Labs, Company may, in its sole discretion, designate a lab for quality assurance testing.

    **8.3.2** **Company Notice.** Without prejudice to the other rights of the Company set forth in this Agreement, not later than the Quality Control Notice Delivery Date, the Company shall give written notice to the Manufacturer of Products actually received by the Company with respect to which the Company shall not have identified any noncompliance with the terms of this Agreement ("**Quality Control Notice**").

  **8.4** **Non-Conforming Products.**

    **8.4.1** **General.** The Company and the Manufacturer shall mutually agree on, and shall properly document, quality standards for all Products. If at any time, the Company reasonably

9

EXHIBIT 2

determines that Products do not meet the agreed upon quality standards, the Company promptly shall notify Manufacturer in writing of such determination (a "**Quality Notice**").  After receipt of a Quality Notice, the Manufacturer shall have five (5) Business Days to correct the lack of conformity identified by the Company or, if such correction cannot be made within five (5) Business Days, to cease manufacturing any Products affected by such lack of conformity until such lack of conformity has been corrected; provided, however, if Company reasonably determines and so specifies in a Quality Notice that the lack of conformity results from contamination or poses and immediate threat to the public, then Manufacturer shall have one (1) Business Day after receipt of such Quality Notice to correct the lack of conformity or, if such correction cannot be made within one (1) Business Day, to cease manufacturing any Products affected by such lack of conformity until such lack of conformity shall have been corrected.

   8.4.2   **Certain Consequences.** If the Company shall have delivered a Quality Notice and the Manufacturer shall have failed to cure the deficiencies specified in the Quality Notice in accordance with **Section 8.4.1**, then, without limitation of any other rights or remedies of the Company hereunder or under applicable law, the Company shall be entitled to offset the Price, and all other amounts paid or payable by the Company, for each such Product against any and all other amounts payable under this Agreement.

   8.5   **Product Recall or Withdrawal.**  Either party shall immediately advise and consult with the other party as to any Product recall or withdrawal considerations; provided, however, that Company shall have the absolute right to recall or withdraw any Product if it determines in its sole discretion that (A) such Product may be contaminated, (B) the use and/or distribution of such Product may pose an immediate threat to the public, or (C) if such Product otherwise fails to conform to the quality standards required hereunder.  The Company shall bear the cost of any recall or withdrawal unless such recall or withdrawal results from (i) Manufacturer's negligence, willful misconduct or fraud in the manufacture, storage or handling of the Products or procurement of raw materials used in the manufacture of the Products pursuant to this Agreement, or (ii) Manufacturer's breach of this Agreement, and in each case described in clause (i) or clause (ii), Manufacturer shall bear the cost of any recall or withdrawal.

   8.6   **Inspection Rights.**  The Company and its duly authorized representatives shall have the right, during normal business hours and upon reasonable prior notice, for the duration of this Agreement, (A) to inspect all facilities utilized by the Manufacturer in connection with its manufacture, storage or handling of the Products and any raw materials pursuant hereto and to examine the Products in process of manufacture and all processes and operations of Manufacturer that could in any way affect the Products or the raw materials used to manufacture the Products, and (B) to gain reasonable access to the records of the Manufacturer relating to quality control, with 72 hours' notice. In addition, Company shall have access at any time with no prior notice required if it has reason to believe any health or safety issues may exist.

   8.7   **Manufacturer's Records.**  The Manufacturer shall maintain books and records necessary for verifying compliance with the terms of this Agreement, including without limitation Prices and all other amounts paid by the Manufacturer, the results of all federal, state or local regulatory agency inspection reports and sanitation audits affecting the Manufacturer's facilities or equipment or the Special Ingredients, Products or other inventories at the Manufacturer's facilities. The Manufacturer shall notify Company immediately by telephone of any such inspections or audits which indicate the presence of any bacteriological agent or substance that is considered by health authorities to be indicative of either unsanitary practices or of public concern.  The Manufacturer shall make all such books and records available to Company and its designated representatives, from time to time, during normal business hours and upon reasonable prior notice (but immediately in the event of any possible risk to public safety).  Such records shall be maintained by the Manufacturer for a period of 24 months after termination of this Agreement.  The Company shall be entitled to make copies, at its expense, of any such records.

   8.8   **Consumer Response.**  The Manufacturer shall promptly forward to the Company any and

all consumer inquiries related to the Products it receives and shall use its best efforts to cooperate with the Company in the handling of all consumer inquiries and consumer response issues.

**9.     Term and Termination.**

**9.1     Term.** The initial term of this Agreement shall commence on the Effective Date and shall end on the two-year anniversary of the Effective Date (the "**Initial Term**"), and the Initial Term may be extended by one or more subsequent 12-month periods (each, an "**Additional Term**") by mutual written agreement of the parties, in each case, unless lawfully terminated sooner in accordance with the terms and conditions set forth herein.

**9.2     Termination for Convenience.** At any time following December 31, 2020, either party may terminate this Agreement for any reason or no reason by providing the other party not less than 90 days' prior written notice; provided, however, that, in the event of any such termination under this **Section 9.2**, each party shall fulfill all of its obligations under any previously issued Purchase Order or invoice. In addition to its other rights hereunder, the Company may at any time instruct the Manufacturer to, and the Manufacturer shall upon receipt of such instruction, cease performance of any or all of the Manufacturer's obligations hereunder.

**9.3     Termination for Breach.** Except as otherwise provided in this Agreement, either party shall have the right to terminate this Agreement if the other party shall be in breach of any obligation hereunder by giving the party in breach not less than 30 days' written notice specifying such breach and stating that this Agreement will terminate at the expiration of 30 days from receipt of such notice, unless such default is cured within such 30 day time period. Failure of either party to terminate this Agreement for any such breach shall not be deemed a waiver of the right subsequently to do so under the same or any other breach, either of the same or different character.

**9.4     Termination for Bankruptcy.**

**9.4.1.** Either party may immediately terminate this Agreement without any advance notice or opportunity to cure being necessary if the other party discontinues its business or voluntarily submits to, or is ordered by the bankruptcy court to undergo, liquidation pursuant to Chapter 7 of the United States Bankruptcy Code or other applicable law. In the event this Agreement is so terminated by the Company, the Manufacturer, its receivers, representatives, trustees, agents, administrators, successors and/or assigns shall have no right to sell, exploit or in any way deal with or in any of the Products covered by this Agreement, or any carton, container, packaging or wrapping material pertaining thereto, except with and under the special consent and special instruction of the Company in writing, which they shall be obligated to follow.

**9.4.2.** Should the Manufacturer file a petition in bankruptcy or is otherwise adjudicated as bankrupt or if a petition in bankruptcy is filed against the Manufacturer and such petition is not dismissed within 90 days thereafter, or if an involuntary receiver is appointed for it or its business and is not discharged within 90 days thereafter, the Company may immediately terminate this Agreement without any advance notice or opportunity to cure being necessary.

**9.5     Effect of Termination.**

**9.5.1.** Termination of this Agreement shall not release either party from any obligation accrued prior to the date of such termination or from any obligations continuing beyond the termination of this Agreement. Except to the extent otherwise limited herein, termination of this Agreement for any reason shall be without prejudice to any other rights that either party may otherwise have against the other. Unless the Formulas have been assigned to the Company in accordance with **Section 7.3.3**, on the effective date

11

**EXHIBIT 2**

of termination of this Agreement, the License granted under **Section 7.3.1** shall terminate and all use of the Formulas by the Company shall cease; provided that, notwithstanding the termination of the License, all finished Products shall be released to the Company and the Company shall have the right to sell all finished Products.

**9.5.2.** Upon any expiration or termination of this Agreement, (x) the Company agrees to buy from Manufacturer, and the Manufacturer agrees to sell to the Company, all of the Manufacturer's inventory of good and salable finished Products, at the total Price for such Products, and good and usable Special Ingredients, at the price paid by the Manufacturer for such Special Ingredients, including freight; and (y) notwithstanding the foregoing, the Manufacturer shall be responsible for and shall destroy all inventory of Products and Special Ingredients failing to meet the standards set forth in **Section 8** herein above. The Company shall pick up and pay for all Products and Special Ingredients bought back from the Manufacturer within 10 days following the expiration or termination of this Agreement. The Company shall be entitled to access to Manufacturer's facilities to the extent necessary to verify the Manufacturer's compliance with the provisions of this **Section 9.5.2**.

**9.5.3.** **Sections 2.9**, **3.4.4**, **6**, **7.1**, **7.2**, **7.3**, **7.4**, **7.5**, **8.6**, **8.7**, **9.5.3**, **11**, **12.3** and **13** through **21** shall survive termination or expiration of this Agreement.

**10.**     **Authorized Representatives.**

Wherever the Manufacturer is directed by the Company to furnish or supply to or otherwise take some action or perform some obligation in respect of the Company in this Agreement, with the prior written consent of Company, the Manufacturer's authorized representatives may also furnish or supply or otherwise take such action or perform such obligation.

**11.**     **Confidentiality.**

**11.1**     **Obligation.** Each party shall keep confidential and shall not cause or permit the disclosure to any third party of any confidential or proprietary information disclosed by the other party pursuant to this Agreement. Confidential or proprietary information includes, without limitation, prices, cost information, production processes, research, marketing and sales information. The Owned Formula shall be the confidential or proprietary information of the Company, and prior to the assignment of rights to the Company pursuant to **Section 7.3.3**, Formula Information shall be the confidential or proprietary information of each of the Manufacturer and the Company; provided that the Manufacturer expressly acknowledges that the Company shall be entitled to use Formula Information for purposes of manufacturing Products, and activities reasonably related thereto. Such confidentiality requirement shall not apply to any information which (i) has entered into the public domain through no wrongful act or breach of any obligation of confidentiality on the receiving party's or any third party's part; (ii) was in the lawful knowledge and possession of, or was independently developed by, the receiving party prior to the time it was disclosed to, or learned by, the receiving party as evidenced in written records kept in the ordinary course of business by the receiving party; (iii) was rightfully received from a third party not in violation of any contractual, legal or fiduciary obligation of such third party; or (iv) was approved for release by written authorization by the party having rights in such information. Upon expiration or termination of this Agreement, or upon earlier request, each party shall return to the other party, or destroy, all confidential information made available by the other party.

**11.2**     **Compelled Disclosure.** In the event that a party is required by law or court order to disclose any confidential or proprietary information of the other party, that party shall (i) notify the other party in writing as soon as possible, but in no event less than 10 calendar days prior to any such disclosure; (ii) cooperate with the other party to preserve the confidentiality of such confidential information consistent

EXHIBIT 2

with applicable law; and (iii) use its best efforts to limit any such disclosure to the minimum disclosure necessary to comply with such law or court order.

**12.    Indemnification and Product Liability Insurance.**

   **12.1    Indemnification.**

      **12.1.1.**    The Manufacturer shall indemnify, defend and hold harmless the Company and its affiliates and its and their officers, directors, agents, employees, successors, assigns and licensors from and against any and all claims, demands, suits, actions, proceedings, costs, damages, expenses (including without limitation reasonable legal fees and out-of-pocket expenses) and losses arising out of or related to the Manufacturer's gross negligence, willful misconduct, or breach of, or non-compliance with, its representations, warranties or other obligations under this Agreement.  The Manufacturer, upon written request from the Company, will promptly defend or settle such claim, demand, suit, action or proceeding at the Manufacturer's expense; provided that the Manufacturer shall not settle any claim, demand, suit, action or proceeding without the express prior written consent of the Company unless (A) there is no finding or admission of any violation by the Company of any legal requirement or any violation of the rights of any person; (B) the sole relief provided is monetary damages that are paid in full by Manufacturer or a third party; and (C) Company shall have no liability with respect to any compromise or settlement. Nothing herein shall prevent the Company from defending or settling, if it so desires in its own discretion, any such claim, demand, suit, action or proceeding at its own expense through its own counsel.

      **12.1.2.**    The Company shall indemnify, defend and hold harmless the Manufacturer and its affiliates and their officers, directors, agents, employees, successors and assigns from and against any and all claims, demands, suits, actions, proceedings, costs, damages, expenses (including without limitation reasonable legal fees and out-of-pocket expenses) and losses arising out of or related to the Company's gross negligence, willful misconduct, breach of, or non-compliance with, its obligations under this Agreement, as an exclusive remedy.  The Company, upon written request from the Manufacturer, will promptly defend or settle such claim, demand, suit, action or proceeding at the Company's expense; provided that the Company shall not settle any claim, demand, suit, action or proceeding without the express prior written consent of the Manufacturer unless (A) there is no finding or admission of any violation by the Manufacturer of any legal requirement or any violation of the rights of any person; (B) the sole relief provided is monetary damages that are paid in full by the Company or a third party; and (C) the Manufacturer shall have no liability with respect to any compromise or settlement. Nothing herein shall prevent the Manufacturer from defending or settling, if it so desires in its own discretion, any such claim, demand, suit, action or proceeding at its own expense through its own counsel.

   **12.2    Insurance.**    At all times during the term of this Agreement, the Manufacturer shall maintain at its own cost and expense from a qualified insurance company appropriate insurance naming the Company as an additional named insured at commercially reasonable levels of coverage to cover all of its obligations under this Agreement, including, without limitation, general liability insurance and product liability insurance with respect to the manufacture and sale of the Products, whether sold during the term of this Agreement or any time thereafter, in each case with a minimum coverage of $2,000,000 ($1,000,000 per occurrence). Such insurance policy or policies shall provide for 10 days' notice to the Company from the insurer in the event of any modification, cancellation or termination thereof.  The Manufacturer agrees to furnish the Company with a certificate of insurance within forty-five (45) days after execution of this Agreement, and shall not manufacture, distribute or sell any Products prior to the Company's receipt of such certificate. The Manufacturer will provide the Company with at least forty-five (45) days prior written notice of any cancellation, reduction or material change of such coverage.

**EXHIBIT 2**

**12.3     Limitations of Liability.**     The Company's aggregate liability under this Agreement shall not exceed two (2) times the amount paid by the Company to the Manufacturer pursuant to this Agreement during the one (1)-year period prior to the date on which the relevant claim(s) first arose. EXCEPT FOR BREACHES OF **SECTION 11** (CONFIDENTIALITY) OR A PARTY'S WILLFUL MISCONDUCT OR FRAUD, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, AND WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE.

**13.     No Joint Venture.**

Nothing herein shall be construed to create any relationship of employer and employee, agent and principal, partnership or joint venture between the parties. Neither party shall assume, directly or indirectly, any liability of the other party. Neither party shall have the authority to bind or obligate the other party and neither party shall represent that it has such authority.

**14.     Assignment.**

**14.1     No Assignment by Manufacturer.**     Subject to **Section 14.3**, this Agreement and all rights and duties hereunder are personal to the Manufacturer. This Agreement or any portion thereof, or any right or responsibility hereunder, shall not be transferred, assigned, pledged or hypothecated by the Manufacturer (by operation of law or otherwise) without the prior written consent of Company.

**14.2     No Assignment by Company.** Subject to **Section 14.3**, this Agreement and all rights and duties hereunder are personal to the Company. This Agreement or any portion thereof, or any right or responsibility hereunder, shall not be transferred, assigned, pledged or hypothecated by Company (by operation of law or otherwise) without the prior written consent of the Manufacturer.

**14.3     Permitted Assignments.** Notwithstanding the provisions of **Sections 14.1** and 14.2, the consent of the non-assigning party shall not be required in connection with an assignment by an assigning party to: (i) a purchaser of all or substantially all of the assets of the assigning party; (ii) a purchaser of a majority of the equity interests of the assigning party; or (iii) the surviving entity in a merger involving the assigning party.

**15.     Notices.**

All notices, requests, and demands hereunder shall be in writing. Any such notice, request or demand or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid and addressed to the intended recipient at the respective address set forth above; <u>provided</u> that any such address may be changed by any party by written notice to the other given in accordance herewith.

**16.     Amendment and Waiver.**

None of the terms of this Agreement (expressly including, without limitation, all Exhibits hereto) shall be deemed to be waived or amended by either party unless such a waiver or amendment specifically references this Agreement and is in a writing signed by the Company and the Manufacturer.

**17.     Entire Agreement.**

**EXHIBIT 2**

This Agreement and all Exhibits attached hereto (which Exhibits are incorporated herein by this reference) contain the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any previous understandings or agreements, whether written or oral, in respect of such subject matter. This Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

18.  **Severability.**

The illegality, invalidity or unenforceability of any part of this Agreement shall not affect the legality, validity or enforceability of the remainder of this Agreement. If any part of this Agreement shall be found to be illegal, invalid or unenforceable, Agreement shall be given such meaning as would make this Agreement legal, valid and enforceable in order to give effect to the intent of the parties.

19.  **Choice of Law.**

This Agreement shall be governed and construed in accordance with the internal laws (expressly excluding conflicts of law provisions) of the State of Texas. Any conflict or controversy arising out of or in connection with this Agreement or any breach thereof shall be adjudicated in the Federal courts of the United States of America located in Austin, Texas, and competent courts of appeals therefrom.

20.  **Counterparts.**

This Agreement may be executed in several counterparts, each of which when executed by the parties hereto shall be deemed an original, but all of which taken together shall be deemed one and the same instrument.

21.  **Contingencies.**

Whenever performance by a party of any of its obligations hereunder, other than the payment of money due, is substantially or completely prevented by reason of an act of God, strike, lockout or other labor difficulty, transportation dislocation, fuel allocation, shortage of raw materials or supplies, accident or other casualty, production breakdown, requirement or request of governmental authority or other circumstance beyond the reasonable good faith control of or without fault on the part of the party required to act (collectively, "**Force Majeure**"), performance shall be excused for the period during which such state of affairs continues. However, the affected party shall use its best efforts to resume performance hereunder at the earliest practicable date, and shall promptly notify the other party of the occurrence, or threatened occurrence, of any such event or circumstance it reasonably expects will prevent it from performing hereunder and, to the best of its knowledge, the expected duration of such state of affairs.

**[Remainder of this page intentionally left blank]**

**EXHIBIT 2**

    **IN WITNESS WHEREOF,** the parties have caused this Agreement to be executed as of the date first above written.

        **SERFACE CARE, INC. (d/b/a Myro)**

        By: _____
        Name: Jesse Pliner
        Title: COO

        **BERRY GOOD LABS LLC**
        **(d/b/a Texas Beauty Labs)**

        By: _____
        Name: Mary Berry
        Title: Founder + CEO